BLUM COLLINS, LLP
   Craig M. Collins (Bar No. 151582)
   Jacqueline Axtell (Bar No. 137328)
707 Wilshire Boulevard, Suite 4880
Los Angeles, California 90017-3501
Telephone: 213.572.0405
Facsimile: 213.572.0401
collins@blumcollins.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEAK OIL HOLDINGS LLC, a California limited liability company, PEAK OPERATOR LLC, a California limited liability company;<br><br>          Plaintiffs,<br><br>    v.<br><br>COUNTY OF VENTURA, a political subdivision of the State of California.<br><br>          Defendant. | No. _____<br><br>**COMPLAINT FOR:**<br>**(1) VIOLATION OF THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT (UNDER 42 U.S.C. §1983)**<br>**(2) VIOLATION OF CIVIL RIGHTS – PROCEDURAL AND SUBSTANTIVE DUE PROCESS (42 U.S.C. §1983)**<br><br><u>JURY TRIAL DEMANDED</u> |

# INTRODUCTION

1. This complaint seeks damages for a taking of private property arising under the Fifth Amendment to the United States Constitution.

2. In 2012, Plaintiffs Peak Oil Holdings LLC and Peak Operator LLC (collectively "Peak") acquired the rights to develop the minerals at all depths to certain property in Ventura County (the "County") pursuant to a long-term oil and gas lease. The rights it acquired constitute its only economic interest in that property.

3. When Peak acquired its rights, its rights were governed by a fully vested Conditional Use Permit for the conduct of oil and gas operations on the property (the "Vested CUP"). The existence of this fully vested CUP, which required only ministerial, non-discretionary zoning clearance approvals, was the primary factor that persuaded Peak to invest in the project.

4. Under the Vested CUP, Peak submitted a non-discretionary zoning clearance to the County seeking clearance to drill and operate 24 wells on the property and to construct associated facilities. The County granted ministerial clearance ZC12-1052 in 2012. Ministerial Clearance ZC12-1052 gave Peak clearance to implement some of its vested rights granted by the Vested CUP. Peak intended to seek additional ministerial clearances later to implement the rest of its vested rights under the Vested CUP.

5. From 2012 to 2019, in reliance on its vested rights under the Vested CUP and Ministerial Clearance ZC12-1052, Peak invested over $100 million in developing the minerals and conducting oil and gas operations on the property, including drilling 15 of the 24 wells cleared by Ministerial Clearance ZC12-1052. Peak did so in compliance with all environmental, health, safety and other regulations. Over the years, Peak worked closely and cooperatively with County and State regulatory agencies as it drilled and operated wells on the property.

6. The oil market suffered an economic downturn from late 2014 to late

2017. When the oil market began to rebound in 2017, Peak submitted another zoning clearance (the "2017 Ministerial Clearance") to finish uncompleted work described in Ministerial Clearance ZC12-1052 and for additional wells and other facilities authorized by the Vested CUP. Peak's 2017 Ministerial Clearance conformed fully with the Vested CUP. Peak, working with County representatives, expected an expedited approval process of this non-discretionary clearance. However, the County took no action on the application.

7.   Instead, the County began the process of slow-walking and ultimately taking Peak's vested rights under the Vested CUP. The County did so through the pretext of construing code violations where none existed or identifying minor code violations and then preventing Peak from correcting those violations.

8.   By this time in 2019, the County had been subject to increasing political pressure from third party environmental groups to curtail oil and gas operations in the County. Some members of these groups made numerous, unfounded, false charges against Peak, including, but not limited to, false claims that Peak was engaged in so-called "fracking" operations and injecting toxic materials downhole.

9.   In January 2019, the County issued a Notice of Violation to Peak regarding certain aspects of its operations. The alleged violations were factually and legally incorrect, or minor and easily correctable, mainly premised on Peak's alleged failure to remove certain temporary facilities which Peak had been asking the County for permission to remove for over a year. Peak had requested this approval as part of its application for the 2017 Ministerial Clearance which the County did not timely act on.

10.   The purported issues in the Notice of Violation were meritless or minor and easily resolved. Had the County approved Peak's 2017 Ministerial Clearance application, Peak would have had the approval it needed to abate the alleged violations nearly 15 months before the County issued the Notice of

Violation. Peak would have abated any alleged violations had the County allowed it to do so.

11. Peak timely filed an administrative appeal of the Notice of Violation. In response to the Notice of Violation, Peak also proposed a compliance agreement, at the County's request, that would have given Peak the permission it needed from the County to resolve the alleged issues in the Notice of Violation. The County failed to respond to Peak's proposed compliance agreement. Despite Peak's diligent attempts and full cooperation to resolve the issues with the County, the County thwarted any resolution. The County intended to use the purported violations as a pretext to take Peak's property, and thus the County unreasonably avoided all reasonable efforts by Peak to resolve the violations to the County's satisfaction.

12. Rather than respond to Peak's offer in the proposed compliance agreement to resolve any issues, the County issued a Notice of Nullification in or about April 22, 2019. This purported to nullify Peak's 2012 zoning clearance, under which Peak had been operating for over six years with multiple County reviews and oversight, with no good-faith basis. The Notice of Nullification forced Peak to immediately cease all operations, thus taking away all or substantially all of Peak's economically beneficial use of its property.

13. The asserted reason for the Notice of Nullification was transparently false – a meritless claim that back in 2012, Peak's zoning clearance application was not in "full, true and correct form." Peak's 2012 application was full, true, and correct. Peak timely appealed the Notice of Nullification but to no avail.

14. The day after it issued the Notice of Nullification, the County imposed a moratorium on all new drilling regarding Peak's project and extended it twice through year-end 2020.

15. Peak filed an As-Built zoning clearance application in mid-2019 to get approval to continue operating. The County failed to act timely on this application.

16. The actions taken by the County terminated Peak's existing operation.

17. In 2020, the County claimed for the first time that Peak never had the authority to develop the shallow oil reserves under the Vested CUP or approved zoning clearances, despite the well documented County approvals and decisions on file. The County claimed for the first time that non-discretionary zoning clearance approvals were no longer "appropriate" under the Vested CUP for Peak's project due to "intensification of land use." The County mandated that Peak expediently remove all equipment on the site as unauthorized and then imposed a $250 per day civil penalty until all equipment is removed from the site.

18. The County denied Peak's appeals and thus Peak has exhausted all administrative remedies.

19. Because the County's actions have deprived Peak of all or substantially all economically beneficial use of its property with no compensation, Peak now seeks compensatory relief under the Takings Clause of the Fifth Amendment to the United States Constitution. The County's violation of the Takings Clause has caused Peak damages, and entitles Peak to just compensation, in amounts over the more than $100 million Peak has invested. The County has also taken Peak's vested but as-yet unimplemented rights under the Vested CUP.

## JURISDICTION AND VENUE

20. The claim arises under the Fifth Amendment to the United States Constitution, as incorporated against the states by the Fourteenth Amendment. The Court has jurisdiction under 42 U.S.C. §1983 and 28 U.S.C. §1331.

21. Venue is proper in the Central District Court of California under 28 U.S.C. §1391(b) because this action concerns an unconstitutional taking of private property in Ventura County, California, within the jurisdiction of the Central District.

## PARTIES

22. Plaintiff PEAK OIL HOLDINGS LLC is now, and at all relevant times was, a California limited liability company.

23. Plaintiff PEAK OPERATOR LLC is now, and at all relevant times was, a California limited liability company.

24. Defendant COUNTY OF VENTURA is a political subdivision of the State of California.

## FACTS

### Peak Acquired The Property In 2012

25. Around June 2012, Peak purchased a long-term minerals lease with HBH Farm, LLC (the "Lease"), thereby acquiring the right to develop the oil, gas and minerals under the leased property, at 4201 Sturgis Road, Oxnard, CA 93030 in the Oxnard Oil Field in an unincorporated area of Ventura County (the "Mineral Development Rights"). Peak's economic interest in the property is based on this right to extract minerals from this property.

26. When Peak acquired the Mineral Development Rights, those rights were subject to the "Vested CUP." The existence of the Vested CUP was a cornerstone of Peak's decision to acquire the Mineral Development Rights and to invest over $100 million in developing oil and gas operations on the property. Peak had reasonable investment-backed expectations that it would enjoy a positive return on its investment made in reliance on the Vested CUP.

27. Shortly after acquiring the Mineral Development Rights, and consistent with the Vested CUP authorizing oil development on the property, Peak obtained from the County a zoning clearance to drill 24 wells and to construct related facilities on the property, which is known herein as Ministerial Clearance ZC12-1052.[1]

### Peak Began Operations under Its Vested CUP and the Ministerial Clearance

28. Peak began the development immediately under Ministerial Clearance

---

[1] Based on direction from the County, ZC 2012 was renewed in 2015, but the key terms remain the same, and the County has always referred to the operative zoning clearance as ZC 2012, and not the 2015 renewal. In this Complaint, "Ministerial Clearance ZC12-1052" refers both to the 2012 clearance and the 2015 renewal.

ZC12-1052 by drilling nine of the 24 approved wells and installing supporting temporary and permanent facilities. As per common industry practice, Peak initially installed temporary facilities to quickly produce oil so it could evaluate the commercial viability of the project in the first 9-12 months or so. Peak began operating those first nine wells in about October 2013.

29. Peak installed temporary facilities in 2013 and 2014 to the south of the main pad, leaving enough room to the north to build the permanent main pad extension for the installation of the planned permanent facilities and additional wells per ZC12-1052 scope, which would allow production to continue while constructing the main pad and permanent facilities. In late 2014, the County and all other applicable agencies permitted and approved other permanent operations such as the fuel gas pipeline installation and the main pad construction.

30. Due to the economic downturn in the oil market from late 2014 through late 2017, Peak did not immediately install its permanent facilities or drill additional wells during that period.

31. In or about late 2014, the County told Peak that the remaining scope (i.e., the permanent facilities and the 15 other approved wells) of Ministerial Clearance ZC12-1052 had expired under its own terms. Peak thus continued operating the temporary facilities longer than initially planned (many of which were not shown on, or required to be shown on, the application for the Ministerial Clearance ZC12-1052, which only required and showed the planned permanent development) at the southern portion of the Property.

32. The County raised no objection regarding Peak's operation of the first nine wells, including in 2014 when Peak obtained County approval for the fuel gas line and dirt work for the main pad. In other words, the County had declared the approval for the remaining 15 wells had expired but allowed Peak to perform site work for those 15 wells. The County raised no objection when Peak obtained Ministerial Clearance ZC12-1052 in 2015.

33. Due to the downturn in the worldwide and domestic oil markets, Peak continued operating only the initial phase of the development (i.e., the temporary facilities for the first nine wells). Peak incurred financial losses from operating during the downturn to keep intact its team, project and the Vested CUP and approved zoning clearance.

34. Peak always intended to remove the temporary facilities for the first nine wells as part of completing the final scope of work for the Ministerial Clearance ZC12-1052 (or perhaps in connection with an application for an expanded zoning clearance to construct additional wells and facilities beyond the scope of Ministerial Clearance ZC12-1052). Peak submitted a document to the County (which the County approved) on or about October 16, 2014 that illustrated select permanent equipment in temporary locations. Peak discussed the forced delay of the temporary-to-permanent equipment transition with the County.

35. The County repeatedly told Peak that no further approvals for the temporary facilities (such as an update to the zoning clearance) were required until Peak was ready to construct its final permanent equipment on the property. The County also advised Peak on several occasions that when Peak was ready to construct the permanent facilities and pad, Peak need not return to the County for further planning entitlements (because Ministerial Clearance ZC12-1052 already approved up to 24 wells, 15 of which had yet to be drilled). Rather, the County told Peak that when Peak was ready to install the other facilities and wells allowed by Ministerial Clearance ZC12-1052, Peak should go directly to the County Building & Safety Department for approvals for the permanent equipment.

36. Peak relied on its Vested CUP and Ministerial Clearance ZC12-1052 as it invested over $100 million into this project.

**Peak Submitted an Updated Zoning Clearance Application in 2017**

37. In or about September 2017, when oil prices started rising and oil extraction at Peak's property seemed likely to become economically feasible again,

Peak prepared and submitted to the County an updated Zoning Clearance application ("Ministerial Clearance ZC17-1084") for a total of 79 wells on the Property. The scope of work for Ministerial Clearance ZC17-1084 included the removal of the temporary facilities and the replacement of those facilities with permanent facilities, and the full development of the property as always planned, including the remaining work scope from the previous Ministerial Clearance ZC12-1052.

38. Consistent with Peak's Vested CUP, County planning manager Brian Baca told Peak's President and Chief Executive Officer, Robert Bell, and County planning staffer Bonnie Luke, that the County would fast-track the Ministerial Clearance ZC17-1084 application and pre-schedule Planning Commission and Board of Supervisors meetings to push the application through the process quickly. Mr. Baca confirmed that the Vested CUP was "fully vested" and that any zoning clearance application in full conformance with the Vested CUP was subject to non-discretionary approval.

39. Two and a half months after receiving Peak's application for Ministerial Clearance ZC17-1084, County planner Bonnie Luke and the new County Planning Manager, Jennifer Scholl, met with Peak's president Robert Bell. In this meeting and a follow-up email, the County requested several revisions for clarity and asked Peak to "clearly differentiate" the uncompleted scope of work in Ministerial Clearance ZC12-1052 (which Peak was now intending to complete) from planned new work (i.e., work that was encompassed within the Vested CUP but outside the scope of Ministerial Clearance ZC12-1052). The County then reversed its long standing decision that ZC12-1052 had expired and informed Peak that Ministerial Clearance ZC12-1052 was still valid and Peak could complete the remaining, uncompleted, scope of work encompassed within that previously issued clearance. Peak revised its application for the Ministerial Clearance ZC17-1084 as requested by the County and re-submitted its revised application for Ministerial

Clearance ZC17-1084 to the County on February 1, 2018.

40. After receiving the County's confirmation that the remaining scope of work under ZC 2012 was already cleared, Peak drilled six of the remaining 15 wells covered by that previous clearance from March to June 2018 while awaiting the County's approval of Ministerial Clearance ZC17-1084.

**The County's Delay in Processing ZC 2017**

41. The County failed to promptly act on Peak's application for Ministerial Clearance ZC17-1084. Instead, after the initial delay of more than two months, the County waited over two months after Peak submitted the requested revised application until April 2018 to conduct a site visit (which was unusual for a ministerial application). Due to the prolonged delay, Peak requested face-to-face meetings with the County which were held in May, June and September 2018. In these meetings, the County continually raised various legal and philosophical type questions (i.e., did Peak have vested rights, did Peak have the authority to drill shallow wells, etc.) designed to delay the process rather than advance it, without ever documenting any violations or problems with the development or operations. During 2018 when Peak pressed the County for updates and progress on its application, the County continually responded with comments about the anti-oil groups and that the County was waiting on legal reviews and input. In retrospect, it appears that by this time County officials were scheming to find a way to deprive Peak of its vested right to drill for oil (without compensating Peak for taking its property rights).

42. In the June 2018 meeting, the County suggested that Peak submit a compliance agreement (and forwarded a template to Peak) rather than pursuing a zoning clearance. Uncharacteristically, the County conducted another site visit in November 2018 and again did not expediently document any observed concerns. The County's unreasonable delay in processing Peak's application for Ministerial Clearance ZC17-1084 prevented Peak from performing the work encompassed

within that application. Peak's application for Ministerial Clearance ZC17-1084 was a *non-discretionary* request, under a *Vested* CUP, that should have been promptly processed.

**The Notice Of Violation**

43. On or about January 18, 2019, well over a year after Peak had applied for Ministerial Clearance ZC17-1084, the County issued a Notice of Violation to Peak. The Notice of Violation raised several issues which were caused primarily by the County's failure to promptly approve Peak's application for Ministerial Clearance ZC17-1084. Had the County timely approved Peak's non-discretionary application for Ministerial Clearance ZC17-1084 instead of inexplicably slow-walking it (or "no walking" it), Peak could have removed the temporary facilities and replaced them with permanent installations as it had always planned to do. This would have resolved most of the issues alleged in the Notice of Violation.

**Peak Timely Appealed The NOV on January 28, 2019**

44. Peak attempted to work with the County to resolve the issues raised in the Notice of Violation. Besides attempting to obtain the County's approval of its application for Ministerial Clearance ZC17-1084, which if granted would have allowed Peak to resolve issues raised in the Notice of Violation, Peak also prepared (at the County's request) a compliance agreement designed to resolve the issues in the Notice of Violation. A compliance agreement is a written plan that a property owner who has received a Notice of Violation can submit to the County which explains how the property owner will address any alleged violations. The County failed to respond promptly to Peak's proposed compliance agreement—despite several attempts to follow-up made by Peak's representatives.

45. On January 28, 2019, Peak timely filed a Notice of Appeal ("NOV Appeal") of the Notice of Violation. The issues raised in the Notice of Violation (1) were factually and/or legally incorrect or easily correctable; (2) were timely appealed; and (3) Peak was working with the County to resolve the issues raised.

**The County Nullified Peak's Right To Operate**

46. On April 22, 2019, just two business days after Peak submitted its proposed compliance agreement and despite the pendency of Peak's appeal of the Notice of Violation, the County took more drastic action: the County issued to Peak a "Notice of Nullification" which purported to nullify Ministerial Clearance ZC12-1052 (i.e., the zoning clearance under which Peak had been operating since 2012). The County based the Notice of Nullification on the incorrect assertion that Peak's application for Ministerial Clearance ZC12-1052, submitted back in 2012, was not in "full, true and correct form" because, the County falsely claimed, Peak never planned to complete the work scope approved in the clearance.

47. The next day, the County imposed a moratorium on additional drill wells in the Peak project and extended it twice through year-end 2020. Thus, the County erroneously revoked Peak's right to operate, and then barred Peak from seeking a replacement right to drill additional wells. The County's purpose has simply been to deprive Peak of vested drilling rights and to avoid following its constitutional duty to compensate Peak for taking those rights.

48. The Notice of Nullification rendered Peak's economic interest in the property worthless. Although Peak had invested over $100 million in the project, in reliance on a Vested CUP and a non-discretionary zoning clearance issued over seven years earlier, the County with no legitimate basis nullified Peak's right to enjoy any economic benefit from its Mineral Development Rights.

49. Because the County nullified Ministerial Clearance ZC12-1052 under which Peak was conducting its oilfield operations, Peak had to cease all of its operations conducted under Ministerial Clearance ZC12-1052. The County's Non-Coastal Zoning Ordinance, Section 811-6.2.3, states "No person shall carry on any of the operations authorized to be performed under the terms of any permit during any period of suspension thereof …"). In short, the County shut down Peak's entire operations though the Notice of Nullification.

**The Notice of Nullification Is Based on Pretextual and False Contentions**

50. The Notice of Nullification is premised on the baseless contention that the temporary facilities on the Property are permanent facilities due to their duration on the site and that, for this reason, Ministerial Clearance ZC12-1052 "did not accurately depict or describe the actual design and scope of Peak's intended development of the site, as evidenced by the discrepancy between Peak's submitted plans and the facilities actually installed temporarily at the site."

51. Nothing about Peak's temporary facilities support the County's claim that Peak's Ministerial Clearance ZC12-1052 application "was not in full, true and correct form." The opposite is true. Peak never represented to the County that its temporary facilities were part of its actual long-term plan to develop the site pursuant to Ministerial Clearance ZC12-1052. In every meeting, written communication, oral communication, or any other contact with the County, Peak representatives explained that those temporary facilities would be removed as soon as Peak has legal approval from the County to move forward with further development of the site. Peak submitted the same scope of work in zoning clearance applications in 2012, 2015, 2017 and again in 2018.

52. Peak has spent millions of dollars seeking approval for, and implementing, its permanent plan outlined in Ministerial Clearance ZC12-1052, including expenditures for third-party engineering design and field operations; purchasing required emission credits; making advance payments for the final design and to procure raw materials; and conducting soil borings to support the design and permitting of the expanded main pad outlined in Ministerial Clearance ZC12-1052.

53. It is ludicrous to suggest that Peak invested over $100 million in this project with the intention of only drilling nine wells supported by inferior limited temporary facilities that could not process oil production from the number of wells outlined in Ministerial Clearance ZC12-1052. It has been the County's own delays, stonewalling, and failure to act on Peak's applications and proposals that has led to

the temporary facilities still being on the property.

54. To attempt to preserve its existing operations during its appeals, Peak applied for an as-built zoning clearance to the County on July 15, 2019 ("As-Built Clearance Application-2019"). The County failed to respond timely to this submission.

55. The County implemented the NOV, the Nullification and the moratorium to terminate Peak's existing operations without paying constitutionally required compensation. After denying Peak's administrative appeals, the County now claimed, eight years after the fact, that Peak never had the authority to develop the shallow oil reserves under the Vested CUP and thus its entire operation was in violation, despite having issued many approvals to Peak along the way. The County suddenly claimed for the first time that non-discretionary approvals under the Vested CUP were no longer "appropriate" due to an "intensification of land use." The County then mandated that all equipment was unauthorized and must be expediently removed from the site. In October 2020, the County imposed a $250 daily civil penalty until all of the equipment is removed from the site.

56. By issuing a baseless Notice of Nullification and its other actions that deprived Peak of all or substantially all of the economically beneficial use of its Mineral Development Rights (Peak's only property rights in the property at issue), without just compensation, the County has violated the Takings Clause of the Fifth Amendment to the United States Constitution, and caused Peak substantial damages, believed to be well over $100 million.

**Peak Has Exhausted Its Administrative Remedies**

57. All attempts by Peak to work with the County and resolve its dire situation proved fruitless. Peak even revised its application for Ministerial Clearance ZC17-1084 in every possible way required by the County to fast track the approval process so Peak could remove the temporary facilities and replace them with facilities in their permanent locations. Yet, the County took no timely

action on Peak's applications for Ministerial Clearance ZC17-1084.

58. On January 28, 2019, Peak appealed the Notice of Violation, and sought to work with the County to resolve the underlying issues. The County suggested that Peak submit a proposed compliance agreement to resolve those issues, which Peak did, and then the County ignored the proposed compliance agreement. Just two business days after Peak submitted the proposed compliance agreement submitted to the County, the County sent Peak the Notice of Nullification, prohibiting Peak from continuing to conduct any further operations.

59. On May 2, 2019, Peak timely filed an administrative appeal of the Notice of Nullification. Peak's Notice of Nullification appeal was to be heard concurrently with its NOV Appeal. On July 15, 2019, Peak submitted to the County its As-Built Clearance Application-2019 hoping to get approval for the facilities at the site. The County took no timely action on this application.

60. The County placed Peak's NOV appeal and Notice of Nullification appeals on the Planning Commission's calendar for August 8, 2019 and cancelled the hearing twice before it finally heard and denied Peak's appeals in November 2019. Peak appealed those denials to the County Board of Supervisors, which ultimately denied Peak's appeals in March 2020. Peak has exhausted all possible administrative remedies.

61. After denying Peak's administrative appeals and effectively revoking its vested permit, the County denied Peak's applications for Ministerial Clearance ZC17-1084 and As-Built Clearance-2019, and Peak's proposed compliance agreement. The County never acted on those applications when it would have mattered. The County ignored those applications to prevent Peak from curing the pretextual violations that the County intended all along to use as the basis for accomplishing its predetermined goal of revoking Peak's vested permit.

62. The County has stripped Peak of any right to economically benefit from its property. Any further attempts to seek relief from the County would be

futile. Peak's constitutional rights have been seriously and materially infringed, entitling it to immediate relief from this Court. Peak is suffering severe and irreparable damages every day. Peak has no choice but to move forward with this lawsuit to vindicate its rights.

63. Peak has no issue with legitimate environmental and regulatory concerns, and always strived to conduct its operations in full compliance with all regulations with strict attention to the environment and safety. In fact, in 2018, Peak offered to the County that it would abide by all modern ordinances and regulations in its project despite that its Vested CUP meant that Peak was not subject to later-adopted ordinances. At that time, Peak also communicated to the County the many environmentally friendly operations that it had implemented and planned to implement. The County never responded to this pledge or concession which further indicated that the County's true agenda was to stop Peak from exercising its rights under its Vested CUP.

# FIRST CAUSE OF ACTION

**Taking of Private Property Without Just Compensation**

**in Violation of the Takings Clause of the Fifth Amendment (42 U.S.C. §1983)**

**(All Plaintiffs against all Defendants)**

64. Peak incorporates and realleges all allegations in paragraphs 1-63 as if fully set forth herein.

65. Under the color of state law, the County has engaged in regulatory and other activity that has deprived Peak of all or substantially all of the economically beneficial use of its Property.

66. The County's actions interfered with Peak's distinct investment-backed expectation associated with developing oil and gas operations on its Property, in reliance on vested rights.

67. The County has caused an unconstitutional taking of Peak's property

for which the County has not paid Peak any compensation. The taking has been permanent or in the alternative temporary.

68. The County's actions and intentional inactions constitute action under color of law, or state action, in violation of the Fifth Amendment of the United States Constitution, and constitute a taking of property for public use without compensation and is contrary to the Fifth Amendment of the United States Constitution.

69. The County must pay Peak just compensation in the amount according to proof at trial, but which is no less than $100 million.

## SECOND CAUSE OF ACTION
### Denial of Substantive and Procedural Due Process
### (42 U.S.C. §1983)
### (All Plaintiffs against all Defendants)

70. Peak incorporates and realleges all allegations in paragraphs 1-69 as if fully set forth herein.

71. The actions of the County have been arbitrary, capricious, unreasonable and pretextual, and part of a concerted effort to prevent Plaintiffs from development of their property rights and to prevent the ripening of claims. The County's actions and inactions were pretextual, part of an intentional effort to prevent the development of property rights and prevent the ripening of legal claims.

72. Plaintiffs have incurred and will continue to incur attorneys' fees, expert witness fees, and other fees and costs, as a result of this proceeding, in amounts that cannot yet be ascertained but which are recoverable pursuant to the provisions of 42 U.S.C. §§ 1983 and 1988.

73. The actions of the County are arbitrary, capricious, unreasonable and pretextual, and part of a concerted effort to revoke Plaintiffs' vested rights, including the right to drill for oil.

74. Under the color of state law, the County has caused damage to Peak.

75. The County must pay Peak compensation in the amount according to proof at trial, but which is no less than $100 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against the County as follows:

1. An award of just compensation and other damages in the amount according to proof;

2. Attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988,

3. Such other and further relief as the Court may deem just and proper.

BLUM COLLINS, LLP
Craig M. Collins


By    /s/Craig M. Collins ................................................................

Craig M. Collins
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

BLUM COLLINS, LLP
Craig M. Collins

/s/Craig M. Collins
By _____
Craig M. Collins
Attorneys for Plaintiffs